UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ APR 1 4 2010 ★

**BROOKLYN OFFICE**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY AND ALLSTATE NEW JERSEY INSURANCE COMPANY, | Civil Action No._____ |

Plaintiffs,

vs.

DANIEL LEVY A/K/A DIMA, ALEX LEVY
A/K/A SASHA, HOI YAT KAM, M.D.,
SALVATORE LENTINI, D.C., YAN YAN
YU A/K/A ANGELA, HAROUTYOUN
TIKRANIAN, D.C., LAI FAN XUE, A/K/A
LISA, CHENG HE SU, ALEKSANDRA
GASHINSKAYA, M.D., BRONX
SHERIDAN MEDICAL, P.C., NEW LITE
BRONX MEDICAL, P.C., COMFORT
CHIROPRACTIC, P.C., ALIGN
CHIROPRACTIC CARE, P.C., QI BAO
ACUPUNCTURE, P.C., TAI JI
ACUPUNCTURE, P.C., DESMOND
CONNELL, ESQ., MARY JIMENEZ,
LLOYD MODESTO, RONALD
SCHWARTZ, DAN MADRID, BEST STAR
ADVERTISEMENT CORP., PRO-TWO
MANAGEMENT CORP., AND UNITED
MEDICAL BILLING & COLLECTION
CORP.,

Defendants.

**CV10- 1652**

**BLOCK, J.**

**POHORELSKY, M.J.**

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PREJUDGMENT ATTACHMENT OF ASSETS OF ALL DEFENDANTS

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate New Jersey Insurance Company, (collectively "Allstate" and/or "plaintiffs"), pursuant to Fed. R. Civ. P. 64 and New York Civil Practice Law and Rules §§ 6201 and 6212, respectfully request that this Honorable Court enter an Order **GRANTING** a prejudgment writ of attachment in the amount of $2,750,000.00 against the assets of defendants, Daniel Levy, Alex Levy, Hoi Yat Kam, M.D. ("Kam"), Salvatore Lentini, D.C. ("Lentini"), Haroutyoun Tikranian, D.C. ("Tikranian"), Yan Yan Yu ("Yu"), Cheng He Su ("Su"), Aleksandra Gashinskaya, M.D. ("Gashinskaya"), Lai Fan Xue ("Xue"), Desmond Connell, Esq., ("Connell"), Mary Jiminez ("Jiminez"), Lloyd Modesto ("Modesto"), Ronald Schwartz ("Schwartz"), Dan Madrid ("Madrid"), Bronx Sheridan Medical, P.C. ("Bronx Sheridan"), New Lite Bronx Medical, P.C. ("New Lite"), Comfort Chiropractic, P.C. ("Comfort"), Align Chiropractic Care, P.C. ("Align"), Qi Bao Acupuncture, P.C. ("Qi Bao"), Tai Ji Acupuncture, P.C. ("Tai Ji"), Best Star Advertisement Corp. ("Best Star"), Pro-Two Management Corp. ("Pro Two"), and United Medical Billing & Collection Corp. ("United Medical") (collectively "defendants"), pending the resolution of the above-captioned action. In addition, Allstate requests that defendants be ordered to disclose all of their assets. In support of the relief requested, plaintiffs aver as follows:

## I.    **INTRODUCTION**

The plaintiffs' lawsuit seeks damages under the federal RICO statute in connection with defendants' creation and perpetration of an insurance fraud scheme. *See* Docket # 1. The plaintiffs also seek declaratory relief and damages under state law including: (1) common law fraud; (2) unjust enrichment; and (3) unfair and deceptive business practices in violation of N.Y. Gen. Bus. Law § 349.

2

In its Complaint, Allstate alleges that Daniel Levy and Alex Levy, working in concert with co-conspirator licensed medical professionals, Kam, Lentini, Tikranian, Yu and Su, their fraudulently incorporated medical professional service corporations, Bronx Sheridan, New Lite, Comfort, Align, Qi Bao, Tai Ji (collectively "PC Defendants"), clinic employees, Aleksandra Gashinskaya and Xue, co-conspirator attorney, Connell, co-conspirator hospital employees, Jimenez and Modesto, co-conspirators "steerers," Schwartz and Madrid, and co-conspirator management companies, Best Star, Pro-Two, and United Medical (collectively "Management Companies") defrauded Allstate of hundreds of thousand dollars over the course of many years. Allstate alleges that the defendants accomplished their scheme by creating fictitious medical facilities that held themselves out to Allstate as legitimately incorporated medical entities under New York law. In reliance upon their representations, Allstate paid millions to these defendants. Moreover, the defendants furthered their fraudulent activities through an elaborate scheme of money laundering.

The detailed factual support for Allstate's claims is set forth in Allstate's Complaint and the supporting Affidavits of Richard Smith and Michael Bruno filed herewith (the contents of which are fully incorporated herein as if set forth in their entirety). The Affidavit of Michael Bruno (hereinafter "Bruno Aff. ¶ __")—filed in support of Allstate's Motion for Prejudgment Attachment of Assets—is based upon personal knowledge regarding Allstate's investigation of this case, as well as information contained in business record and public record documents admissible under Fed. R. Evid. 803(6), 803(8).

Allstate seeks actual damages in excess of $918,000.00 ($2,750,000.00 trebled pursuant to the RICO statute) against all defendants who will be jointly and severally liable for any judgment entered in favor of Allstate. Accordingly, Allstate requests that this Court grant an Order of attachment of defendants' assets for $2,750,000.00. *See D'Orange v. Feely*, 894 F. Supp. 159, 163

(S.D.N.Y. 1995) (recognizing that trebling of damages and attorney's fees are mandatory under RICO).

## II.    GOVERNMENT CIVIL FORFEITURE-DEFENDANTS' CRIMINAL MONEY LAUNDERING

In connection with the criminal indictments obtained by the Office of the Attorney General of the State of New York, the government simultaneously sought and obtained civil forfeiture against Daniel Levy, Alex Levy, Kam, Connell, Schwartz, Madrid, Bronx Sheridan, New Lite, Best Star and United Medical in an action entitled *Cuomo v. Levy, et. al.*, Supreme Court of the State of New York, County of Bronx, Index No. 251711/2009.

In support of its Application for an Order of Attachment and Temporary Restraining Order, the government submitted the sworn Affidavit of Investigator Richard Smith.  The Smith Affidavit details evidence of (1) the PC entities true corporate ownership and control; (2) defendants' involvement in the scheme to defraud insurance companies; and (3) defendants' money laundering activities.

Based upon the Smith Affidavit, the government's application for an order of attachment and temporary restraining order was granted on September 16, 2009.  Allstate incorporates by reference as if fully set forth herein, the Affidavit of Richard Smith (hereinafter "Smith Aff. ¶ __") in support of its Motion for Prejudgment Attachment of Assets of All Defendants.  Accordingly, a court of competent jurisdiction has already found that the defendants' money laundering activity mandates attachment of several of the defendants' assets.

## III.    ARGUMENT

Pursuant to Fed. R. Civ. P. 64, "the remedy of attachment is governed by state law."  *Bank of China v. NBM, L.L.C.*, 192 F. Supp. 2d 183, 186 (S.D.N.Y. 2002).  Rule 64(a) provides, "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the

state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." *Id.*

New York law provides:

> An order of attachment may be granted in any action,...where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when...the defendant, with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or...is about to do any of these acts....

C.P.L.R. § 6201.

Pursuant to New York law, a party is entitled to an order of "attachment upon demonstrating that (1) it has stated a claim for money judgment; (2) it has a probability of success on the merits; (3) the defendant with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts; and (4) the amount demanded from the defendant is greater than the amount of all counterclaims known to the party seeking attachment." *Bank Leumi Trust Co. of New York v. Istim, Inc.*, 892 F. Supp. 478, 481 (S.D.N.Y. 1995) (citing C.P.L.R. §§ 6212(a) and 6201(3)) (internal quotations omitted) (granting prejudgment attachment request on an *ex parte* basis); *see Bank of China*, 192 F. Supp. 2d at 186-87.

A party seeking an attachment order must demonstrate the existence of each of these elements through a competent affidavit or other written evidence. *Bank of China*, 192 F. Supp. 2d at 187. With respect to requirements one and two, "the court must give the plaintiff the benefit of all legitimate inferences that can be drawn from the facts." *Bank Leumi Trust Co. of New York*, 892 F. Supp. at 482 (citations omitted). As detailed below, Allstate can establish each of the elements required for an order of attachment.

5

### A. Allstate Has Stated a Claim for Money Judgment

In its Complaint, Allstate seeks recovery against the defendants under 18 U.S.C. § 1962 for damages caused by defendants' fraud scheme. Allstate's Complaint also alleges state law causes of action for common law fraud, unjust enrichment, and unfair and deceptive business practices.

Whereas the defendants will be jointly and severally liable for any judgment awarded in plaintiffs' favor, Allstate is seeking actual money damages against the defendants in excess of $918,000.00 (the exact amount to be determined at trial). Bruno Aff.; Docket # 1 at Exhibits 5-10. Based on the foregoing, Allstate has demonstrated that it has stated a claim for money judgment. *See* C.P.L.R. § 6212(a).

### B. Allstate Has a Probability of Success on the Merits of its Claims

In determining whether a party seeking attachment has demonstrated a probability of success on the merits of its claims, "the court must give the plaintiff the benefit of all legitimate inferences that can be drawn from the facts." *Bank Leumi Trust Co. of New York*, 892 F. Supp. at 482. Courts generally construe the term "probability of success on the merits" as "more likely than not." *Bank of China*, 192 F. Supp. 2d at 187 (citations omitted). As detailed herein, Allstate has demonstrated its likelihood of success on the merits of its claims.

#### 1. The Defendants Have Violated the Federal RICO Statute

The defendants' fraudulent conduct fits within the parameters of the federal RICO statute. To state a claim under RICO in the Second Circuit, a plaintiff must establish that (1) the defendant; (2) through the commission of two or more "predicate" acts; (3) constituting a pattern; (4) of racketeering activity; (5) directly or indirectly participates; (6) in an enterprise; (7) the activities of which affect interstate commerce. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1993) (citing 18 U.S.C. §1962(a) – (c)).

Here, Allstate's Complaint describes the allegedly fraudulent scheme, and each defendant's role in the scheme. The Complaint also provides particularized information regarding the dates and

6

specific instances of defendants' mailing of fraudulent submissions to Allstate. The Complaint further alleges that each of the defendants actually used (or could have reasonably foreseen that use of) the mail was an essential element of the alleged fraud. *See United States v. Bortnovksy*, 879 F.2d 30, 36 (2d Cir. 1989) (observing that the question is not whether each defendant actually used the mail but whether each defendant could have reasonably foreseen that the mail would be used as part of the underlying scheme).

### a. *Allstate Will Prove the Element of Enterprise*

The PC Defendants are business entities organized under New York law to conduct the business of providing medical services as regulated by New York law. The Management Companies are business entities organized under New York law to conduct the business of providing medical billing services and other management services under New York law. Accordingly, the PC Defendants and Management Companies each constitute enterprises, the activities of which affect interstate commerce for purposes of RICO.

### b. *Allstate Will Prove a Pattern of Racketeering Activity*

The pattern element of a properly pled RICO complaint requires two acts of racketeering activity within a ten-year period. 18 U.S.C. §1961(5). Allstate has alleged that the defendants committed mail fraud as the predicate act in pleading its RICO claims. "Racketeering activity" is any act which amounts to a violation of the criminal statutes set forth at 18 U.S.C. §1961(1), including mail fraud or aiding and abetting mail fraud under 18 U.S.C. §1341.

To demonstrate mail fraud, a plaintiff must prove "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme and (3) the use of interstate mails...in furtherance of the scheme." *In re Crazy Eddie Sec. Litig.*, 812 F. Supp. 338, 347 (E.D.N.Y. 1993); *see Porcelli v. U.S.*, 2002 U.S. App. LEXIS 18776 (2d Cir. Sept. 13, 2002). A plaintiff need not prove that each defendant personally used the postal system, but only that the defendant acted with the knowledge that the use of the mails would follow in the ordinary course of business, or that

such use would be reasonably foreseeable. *United States v. Maze*, 414 U.S. 395, 399 (1974). A plaintiff need not show that the defendant personally placed the communication into the postal system, *Schmuck v. United States*, 489 U.S. 705, 711-15 (1989), as the aim of the mail fraud statute is to punish the scheme to defraud, rather than the end result. *Sebago v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 82 (D. Mass. 1998) (*citing United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir. 1991) (explaining that "[i]t is not necessary to establish that the intended victim was actually defrauded.").

Allstate will establish this element by illustrating defendants' repeated practice of presenting medical documentation to Allstate from medical professional corporations that were improperly formed and operated by non-licensed persons, seeking no-fault insurance claim benefits. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). This pattern is set out in Allstate's Complaint, which details with particularity numerous invoices, medical reports and checks transmitted by or on behalf of (or caused to be) transmitted by defendants through the United States Mail in violation of 18 U.S.C. §1341. *See* Mail Fraud Chart, annexed to Complaint (Docket # 1) at Exhibit 4.

In assessing whether a plaintiff has met its burden of proving pattern under RICO, a court must examine the predicate acts alleged to determine (1) whether the acts are related; and (2) whether they either show continuity or pose a threat of continuity. *Chubb & Son, Inc.*, 1998 U.S. Dist. LEXIS 22542, at *24. Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise inter-related by distinguishing characteristics and are not isolated events." *Id.* at *25. "The Second Circuit, in turn, has directed the 'relatedness' of predicate acts may be evidenced by their temporal proximity, repetition, common goal and similar methodology." *Id.*

The continuity requirement under RICO can be either closed-end or open-ended. *H.J., Inc.*, 492 U.S. at 241. Closed-end continuity is established upon proof of repeated predicate acts over a "substantial" period of time, i.e., some period of time exceeding weeks or months. *Id.* at 242. In

8

addition, the following factors should also be considered: (1) the number and variety of acts; (2) the number of participants; (3) the number of victims; and (4) the presence of separate schemes. *GICC Capitol Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) (citations omitted). Open-ended continuity is demonstrated by predicate acts that present a threat of repetition. *H.J., Inc.*, 492 U.S. at 241.

As set forth in the Complaint and supporting affidavit, the defendants repeatedly engaged in the same or similar conduct: fraudulently inducing Allstate to pay medical bills submitted by medical professional service corporations which were owned and controlled by non-licensed individuals and entities.

c.   *Allstate Will Prove that Defendants Participated in the Enterprise's Affairs*

The RICO statute requires that an alleged racketeer must "participate, directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C., §1962(c). The Supreme Court has held that "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs, one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). An enterprise is operated or managed by upper management, "lower participants in the enterprise who are under the direction of upper management" and even other outsiders associated with the enterprise "who exert control over it, as for example, by bribery." *Id.* at 184.

The acts of (a) falsifying medical bills and records in connection with insurance claims, and (b) transmitting the false documents, claims information and other misrepresentations by way of the U.S. Mail, demonstrates that the defendants participated in the conduct of the PC Defendants and the Management Companies. Moreover, the submission of medical bills and records via the U.S. Mail by medical professional service corporations owned and operated by non-licensed laypersons further

9

establishes that the non-physician individual defendants controlled the enterprise. *See* Docket # 1 at

Exhibit 4. Therefore, Allstate has satisfied this prong of the RICO test.

d.   *Allstate Will Prove Its Damages*

Allstate must plead: (1) defendants' violation of 18 U.S.C. §1962; (2) an injury to Allstate's business or property; and (3) causation of the injury by defendants' violation. *See Commercial Cleaning Services, LLC v. Colin Services Systems, Inc.*, 271 F.3d 374, 380 (2d Cir. 2001); *see also County of Washington v. Counties of Warren and Washington Indus. Dev. Agency*, 2001 U.S. App. LEXIS 223, *5 (2d Cir., Jan. 3, 2001) (explaining that pattern of RICO acts must have been the proximate cause of plaintiff's injury).

In the Second Circuit, this requirement means that Allstate must prove both "transaction" and "loss" causation. *Id.* Transaction causation means that the misrepresentation must have led the plaintiff to enter into the transaction at issue. *Moore v. Paine Webber, Inc.*, 189 F.3d 165 (2d Cir. 1999). Loss causation means that the misrepresentation must be both an actual and proximate source of the loss that plaintiff suffered. *Id.* There must be a direct relationship between the plaintiff's injuries and the defendant's injurious conduct. *DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001). The proximate cause limitation restricts liability to cases in which the RICO pattern or acts are a substantial factor in the sequence of causation, such that the injury was reasonably foreseeable or anticipated as a natural consequence of defendant's conduct. *See Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 266-267 (D. Conn. 2004); *In re American Express Co.*, 39 F.3d 395, 399 (2d Cir. 1994).

Allstate will prove that it suffered harm as a direct and proximate result of defendants' fraudulent representations. The defendants' act of submitting false bills (i.e., the "transaction") caused Allstate, upon reasonable reliance on said false bills and other documentation, to pay defendants' medical bills submitted in connection with no-fault automobile insurance claims (i.e., the "loss"). As a result of defendants' fraud, Allstate paid in excess of $918,000.00 in medical bills.

Based on the foregoing analysis, Allstate has established a reasonable probability of success on the merits of its RICO claims under 18 U.S.C. § 1962(c) (Count I-IX).

### e. *Allstate Will Prove the Existence of a RICO Conspiracy*

In addition to alleging substantive RICO claims, Allstate's Complaint also alleges a RICO conspiracy in violation of 18 U.S.C. §1962(d). *See* Docket # 1 at ¶¶407-410. The Second Circuit has clearly acknowledged that the "core of a RICO civil conspiracy is an agreement to commit predicate acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990) (citing *Rose v. Bartle*, 871 F. 2d 331, 336 (3d Cir. 1989)).

The complaint must allege that the defendant "willfully participated in at least two ... predicate offenses, that the predicate offenses constituted a pattern of racketeering activity, and that [the defendant] conspired to participate in the affairs of [the enterprise] by engaging in the predicate offenses." *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir.1984), *cert. denied sub. nom, Rabito v. United States*, 469 U.S. 831 (1984). The conspiracy may also "be inferred from circumstantial evidence of [the defendant's] status in the enterprise and his knowledge of the wrongdoing." *Morrow v. Black*, 742 F. Supp. 1199, 1208 (E.D.N.Y.1990); *Cadle Co. v. Flanagan*, 271 F. Supp. 2d 379, 391 (D. Conn. 2003); *see also United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989) (holding that "it is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role").

Allstate's Complaint makes specific allegations of actual knowledge of wrongdoing on the part of each of the individual defendants. In addition, Allstate's Complaint and the Affidavits of Richard Smith and Michael Bruno set forth a detailed outline of the fraudulent activities (including money laundering) and billing schemes (and the defendants' participation therein), thus permitting the conclusion that the individual defendants knew that they were each part of a larger enterprise (of which the U.S. Mail was used in furtherance). Accordingly, Allstate has established a probability of success on the merits of its RICO conspiracy claim (Count X).

12

### 2. The Defendants Have Committed Common Law Fraud

Under New York law, success on a claim for common-law fraud (Count XI) is contingent upon a showing by plaintiff that: (a) the defendants made a misrepresentation or an omission of material fact; (b) the misrepresentations and/or omissions were made with the intent to deceive plaintiff; (c) there was justifiable reliance upon the misrepresentation by plaintiffs; and (d) plaintiffs' injury was caused by the defendants' misrepresentation or omission. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 n.8 (2d Cir. 2006). Allstate will prove that defendants' repeated practice of misrepresenting the actual ownership and/or control of the PC Defendants satisfies each of the elements required to prove common law fraud under New York law. Smith Aff. ¶¶7-8, Bruno Aff. ¶¶14-18.

### a. *Allstate Will Prove Defendants' Material Misrepresentations*

New York State Insurance § 5102 *et seq.* requires No-Fault insurers to reimburse patients for basic economic loss. Unlicensed or fraudulently licensed providers are ineligible for reimbursement under the authority of 11 NYCRR 65-3.16(a)(12) which provides that "a provider of health care services is not eligible for reimbursement under §5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirements..." In *State Farm v. Mallela*, 4 N.Y.3d 313 (2005), the Court of Appeals upheld 11 NYCRR 65-3.16(a)(12) which excludes payments made to unlicensed providers.

Section 1507 of the Business Corporation Law of New York prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such corporation." It also prohibits such shareholder(s) from entering into any agreement with granting proxies to or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

Allstate's Complaint and the supporting Affidavit filed in support of the instant Motion demonstrates that the PC Defendants misrepresented that they were in compliance with the New

13

York laws governing professional corporations. The documents submitted to Allstate misrepresented that Kam, Lentini, Tikranian, Yu and Su were the true owners of the PC Defendants when, in reality, the PC Defendants were owned and controlled by non-licensed laypersons, including Daniel Levy and Alex Levy. Smith Aff. ¶¶7-8, 36-38. The defendants' misrepresentations regarding the PC Defendants' ownership wrongfully caused Allstate to believe that the PC Defendants were eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a) and 11 N.Y.C.R.R. § 65-3.16(a)(12) when, in fact, PC Defendants were actually owned, operated, managed and controlled by non-licensed laypersons.

### b. *Allstate Will Prove Defendants' Intent to Deceive*

The second element required by New York law to support a cause of action for common law fraud is scienter—i.e., knowledge by the party making the misrepresentation that it was false when made. *See Giannacopoulos v. Credit Suisse*, 37 F. Supp. 2d 626, 632 (S.D.N.Y. 1999). With respect to this element, the Second Circuit has held, in different factual circumstances, that the requisite intent exists "[w]hen it is clear that a scheme, viewed broadly, is necessarily going to injure." *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir. 1999).

Allstate's Complaint alleges the illegal corporate practice of medicine in violation of New York law. Thus, defendants would reasonably foresee that their fraudulent activities would harm Allstate. As such, the requisite element of intent to defraud is present in this matter. *See Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995) (holding scienter proven where conduct consciously or recklessly committed).

Allstate's Complaint further satisfies the scienter element by setting forth specific facts demonstrating both a motive and the opportunity to commit fraud through the defendants' realization of direct economic benefit through their fraudulent billing and treatment practices. *See Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir. 1994); *see also Empire Blue Cross and Blue Shield v.*

14

*Tsoi*, No. 95 Civ. 7058 (KTD), 1998 U.S. Dist. LEXIS 4340, *11-12 (S.D.N.Y. 1998) (holding that a doctor's signature on forms when he could not have been the treating medical doctor may constitute an intent to defraud the insurance company).

> c.  *Allstate Will Prove Its Justifiable Reliance on Defendants' (Mis)representations*

Where a fraud claim is pled, the reliance that is alleged must be justified and reasonable. *See Stutman v. Chemical Bank*, 95 N.Y. 2d 24, 30 (2000); *Laurel Ridge, LLC v. A. Alfredo Nurseries, Inc.*, 730 N.Y.S. 2d 447, 447 (2001). Allstate's Complaint satisfies this element whereas it alleges that when Allstate paid claims, it reasonably relied upon the representations that were made by the defendants that the professional corporations were lawfully licensed and authorized to render treatment and were abiding by the New York statutes governing the provision of such services.

Because the representations and/or omissions are matters that are within the exclusive knowledge of the defendants, the defendants' ability to challenge the reasonableness of Allstate's reliance would be limited. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997) (explaining that when matters are within the exclusive knowledge of the defendants, the plaintiff may rely on the representations without pursuing an investigation to ascertain the truth).

> d.  *Allstate Will Prove that Defendants' Misrepresentations Inflicted Damage Upon Allstate*

Allstate must demonstrate that it was injured as a result of the PC Defendants' (mis)representations. *See Laurel Ridge, LLC*, 730 N.Y.S. 2d at 447. Allstate's Complaint specifically alleges that it paid defendants in excess of $918,000 based on the material misrepresentations of fact contained within defendants' billing statements. Allstate made such payments believing that it was legally obligated to do so.

For all the foregoing reasons, Allstate has demonstrated a probability of success on the merits of its common law fraud claim (Count XI).

### 3.   Allstate Will Prove Unjust Enrichment

To prove a claim of unjust enrichment under New York law, Allstate is required to plead and prove: (1) the defendants were enriched; (2) the enrichment was at the expense of the plaintiffs; and (3) that the circumstances were such that equity and good conscience require the defendants to make restitution to Allstate. *See Beth Israel Med. Ctr. v. Horizon Blue Cross  and Blue Shield of New Jersey*, 448 F.3d 573, 586 (2d Cir. 2006) (*citing Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 2002 U.S. Dist. LEXIS 11764, *52 (S.D.N.Y. Jun. 26, 2002); *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997); *Louros v. Cyr*, 175 F.Supp.2d 497, 514 n.8 (S.D.N.Y. 2001). In its Complaint, Allstate alleges that defendants wrongfully obtained payments from Allstate through their unlawful activities; therefore, defendants are not entitled to retain the payments that were made by Allstate. *See* Docket # 1 at ¶¶431-435.

Allstate's investigation revealed that the defendants billed and received reimbursement for treatment that was based on fraudulent representations regarding compliance with New York law governing eligibility to receive no-fault benefits. *See* Smith Aff. ¶¶7-8, 136-138. Thus, the PC Defendants are not eligible to receive—or retain—payment for these claims. The legal authority and the evidence gathered during the course of investigation amply supports Allstate's RICO claim, and further supports Allstate's claim for unjust enrichment. *See United States Fire Ins. Co. v. United Limousine Serv.*, 328 F. Supp. 2d 450, 454 (S.D.N.Y. 2004) (reasoning that "[t]he type of activity that gives rise to RICO claims frequently gives rise to lesser state law claims, such as unjust enrichment").

Further, New York permits affirmative recovery actions by insurers relating to fraud and unjust enrichment, notwithstanding New York's "30 day pay-or-deny" rule governing the timely adjustment of no-fault insurance claims. In *Allstate Ins. Co. v. Valley Phys. Med. & Rehab., P.C.,*

2008 U.S. Dist. LEXIS 26180 (E.D.N.Y. Mar. 31, 2008), this Court granted plaintiffs' Motion for

Reconsideration and vacated its decision dismissing plaintiffs' fraudulent billing claims under

theories of fraud and unjust enrichment/restitution. The court's initial decision to dismiss plaintiff's

fraud and unjust enrichment claim was premised on the reasoning that claims arising from fraudulent

billing for excessive/unnecessary services could not be raised affirmatively without a timely denial.

Upon reconsideration, the *Valley Medical* court determined that the preclusion principles

generally applied in connection with the "30 day pay-or-deny" rule would not apply preventing "an

insurer who fails to timely deny a claim from maintaining an affirmative cause of action for fraud (or

unjust enrichment) based on the allegations of billing fraud." *Id.* at 339. Rather, the court

determined that preclusion—if any— was to be confined to "defenses to claims for payment and do

not preclude an insurer from maintaining an affirmative action for fraud or unjust enrichment based

on that same billing fraud." *Id.* at 341. Construing its decision in light of public policy concerns, the

court reasoned:

> If an insurer could not later bring an action for fraud, wrongdoers
> would have an incentive to flood insurers with bogus claims and
> would be unjustly enriched when the insurers found themselves
> unable to uncover the fraud within the 30-day period...Precluding
> affirmative fraud claims would undoubtedly result in the public
> paying higher premiums while individuals who engaged in fraudulent,
> criminal activity reaped the reward.

*Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Grafman*, C.A. No. 04-2609 (E.D.N.Y., May 22,

2007). Accordingly, Allstate is not precluded from asserting affirmative claims for recovery under

an unjust enrichment theory predicated on defendants' commission of a massive medical billing

fraud scheme.

In this case, Allstate based its unjust enrichment claim on the defendants' misrepresentation

regarding their eligibility to receive medical benefits under New York's No-Fault laws.

Specifically, defendants' misrepresentations that Kam, Tikranian, Lentini, Su and Yu were the

owners of the PC Defendants (when, in fact, Daniel Levy and Alex Levy— unlicensed lay

17

persons—were the true masterminds behind the PC Defendants' operation). Thus, the PC Defendants were not eligible to receive payment for these services under New York law, despite their affirmative representations to the contrary. Accordingly, Allstate has demonstrated a probability of success on its unjust enrichment claim (Count XIII).

### C. Defendants Have Secreted Assets with the Intent to Defraud Allstate and/or Frustrate the Enforcement of a Judgment Likely to be Rendered in Allstate's Favor

Allstate's Complaint and the supporting Affidavits filed herewith demonstrate that defendants have secreted assets with the intent to frustrate a potential judgment against them. New York law "requires proof of two elements: (i) that the defendant…has assigned, disposed of, encumbered or secreted property…, and (ii) that the defendant has acted or will act with the intent to defraud his or her creditors, or to frustrate the enforcement of a judgment that might be rendered in their favor." *Bank Leumi Trust Co. of New York*, 892 F. Supp at 482 (citing C.P.L.R. § 6201(3)) (alterations added). In terms of the first element (secreting assets), Allstate need not demonstrate disposition or secretion of property by actual proof. *Id.* Rather, Allstate's showing of a "transfer or disappearance of an abnormal amount of property will suffice."

In terms of the second element (intent to defraud creditors), "[t]he moving papers must contain evidentiary facts as opposed to conclusions establishing the fraud." *Bank Leumi Trust Co. of New York*, 892 F. Supp. at 483. However, because courts have recognized that "[d]irect proof of the fact can rarely be obtained," defendants' fraudulent intent "must ordinarily be inferred from circumstances." *Id.* Accordingly, Allstate has made "a prima facie evidentiary showing of secretion of assets by defendants in fraud of creditors, and particularly in fraud of plaintiff." *Id.* The burden [now] shifts to the defendant to explain the action or rebut the plaintiff's allegations." *Id.* (citations omitted).

18

1. <u>Specific Evidence Regarding Secretion of Assets: Money Laundering</u>

In plain terms, "secretion" of property is defined as follows: "[t]o conceal or secretly transfer (property, etc.), especially to hinder or prevent officials or creditors from finding it." *See* BLACK'S LAW DICTIONARY 1382 (8th ed. 2004). Allstate's Complaint alleges that the defendants laundered the proceeds of their scheme as a means of concealing the existence of their wrongful conduct, and furthering their scheme to defraud. Pursuant to 18 U.S.C. § 1956, the laundering of monetary instruments is defined as follows:

> (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity - -
>
> (A) (i) with the intend to promote the carrying on of specified unlawful activity; or
>
> \*        \*        \*
>
> (B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)

In determining whether a transaction was designed to "conceal," a court may consider a number of factors, including:

> [S]tatements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*United States v. Garcia-Emmanuel*, 14 F.3d 1469, 1475-76 (10th Cir. 1994). Another important consideration in determining whether a transaction was "designed to conceal" is whether "the money

is better concealed or concealable after the transaction than before." *United States v. Johnson*, 440

F.3d 1286, 1291 (11th Cir. 2006) (quotations omitted).

Allstate has made a strong initial showing that defendants engaged in a complex, evolving,

continuous and successful scheme to defraud it of insurance proceeds by obtaining payment for

fraudulent medical bills in connection with insurance claims.  *See* Docket # 1 at ¶¶186-224, Ex.5-10.

The defendants' scheme was facilitated, in part, by the transferring/funneling/laundering of illicitly

procured insurance funds.  Allstate alleges the following in support of its claims that defendants have

secreted assets in an attempt to avoid/frustrate Allstate's efforts at recovering those illicitly-obtained

funds:

        a.    <u>*Evidence Concerning Fraudulent Billing/Illegal Corporate Practice of Medicine*</u>

- Daniel Levy billed for (1) services not provided; (2) services provided for a duration shorter than represented; and (3) services that were not medically necessary;  Smith Aff. ¶3.

- Daniel Levy hired and supervised employees; Smith Aff. ¶1.

- Daniel Levy dictated and monitored patient treatment to ensure economic loss/personal injury; Smith Aff. ¶¶39-53.

- Daniel Levy instructed employees on how to handle insurance company inquiries; Smith Aff. ¶7.

- On October 11, 2006, Attorney Desmond Connell met and offered a Lincoln Hospital nurse $1,000-$1,500 in exchange for allowing steerer Daniel Madrid on her floor.  The same nurse was offered additional money for patient information; Smith Aff. ¶27.

- Daniel Levy offered an Our Lady of Mercy Hospital employee $500 per week for patient information.  The employee sent information for three (3) weeks, but was only paid for two (2) weeks; Smith Aff. ¶28.

- In 2001, Daniel Levy offered another Our Lady of Mercy Hospital employee $300-$500 per patient for information and/or $500 per week; Smith Aff. ¶29.

- On February 17, 2007, a patient told Dan Madrid that he was going to cease therapy because it interfered with his job.  The patient was told that the treatment was a waste of time if he did not treat for at least three (3) months; Smith Aff. ¶31.

- On September 29, 2006, Madrid called Daniel Levy to discuss treatment of a twelve (12) year old boy. Madrid asked Levy what he wanted the boy to complain about; Smith Aff. ¶32.

- On October 17, 2006, Schwartz told Daniel Levy about another patient. Schwartz told Levy that someone will have to talk to the patient when she comes in because she only complains of knee/head pain; Smith Aff. ¶33.

- On February 6, 2007, a patient was involved in a fight following a motor vehicle accident. Daniel Levy instructed the patient to state that the injuries were the result of the motor vehicle accident and not the fight; Smith Aff. ¶35.

- On November 2, 2006, Daniel Levy called New Lite warning that insurance investigators were headed to the New Lite clinic location. Daniel Levy instructed the receptionist to say that New Lite had no manager and that Kam was the owner. Daniel Levy also instructed Alex Levy to leave the clinic until the investigators left; Smith Aff. ¶37.

- On October 30, 2006, Daniel Levy scolded a law firm employee for EUO testimony wherein a patient described Levy as the New Lite manager. Levy warned that he needed to know of all EUOs in advance; Smith Aff. ¶38.

- Daniel Levy directed administrative procedures, payroll, document handling, patient insurance matters, insurance company billing, the purchase of medical supplies, and all medical treatment; Smith Aff. ¶39.

- Daniel Levy directed quotas for medical diagnostic testing; Smith Aff. ¶¶39 and 43.

- On September 21, 2006, Daniel Levy told a receptionist to refer a patient to an orthopedist. The receptionist had not received a referral from Kam or any other medical doctor; Smith Aff. ¶40.

- On September 5, 2006, Daniel Levy told an MRI facility what scans a patient should receive; Smith Aff. ¶41.

- On August 30, 2006, Daniel Levy called a patient to convince him to come in for neurological treatment stating that it was "important to him (i.e. Levy)"; Smith Aff. ¶42.

- On September 6, 2006, Daniel Levy told a patient to continue treatment because he had not yet undergone an IME; *Id*.

- On September 18, 2006, Daniel Levy told a patient to demand a MRI; *Id*.

- On November 17, 2006, Daniel Levy spoke to an employee about recruiting patients for EMG testing; Smith Aff. ¶43.

- On October 4, 2006, Daniel Levy told an employee that the neurologist needed to see at least ten (10) patients per visit. Levy instructed the employee to schedule all No-Fault patients for neurological testing; Smith Aff. ¶46.

- On August 30, 2006, Daniel Levy ordered a receptionist named "Delaney" to get a MRI referral from Dr. Lentini since Dr. Kam did not give one; Smith Aff. ¶47.

- On November 1, 2006, Daniel Levy instructed an employee not to let Kam leave until a new patient arrived. Levy told the employee to put a chain around Kam's leg if necessary; Smith Aff. ¶49.

- On October 27, 2006, Daniel Levy received a call from an attorney looking to purchase services from a doctor. Daniel Levy offered to provide a signed report for $350. The attorney was instructed to prepare his own report using a template, but Daniel Levy would have a doctor sign the report; and Smith Aff. ¶52.

- On October 19, 2006, Daniel Levy called a law firm demanding $300-$350 per case. Smith Aff. ¶59.

  b.   *Specific Evidence of Secretion of Assets Through Illicit Money Laundering Activity*

- $4,000,000.00 was paid to the PC Defendants, $2,000,000.00 of which was funneled to Management Companies owned and controlled by Daniel Levy; Smith Aff. ¶163.

- No money was paid to Kam; however, $300,000.00 was paid to his wife, Melinda Kam; Smith Aff. ¶161.

- $1,000,000.00 in checks were cashed at various check cashing facilities; *Id.*

- Bronx Sheridan was paid $1,633,733.00 by insurers;
  - $731,818.00 was paid to the Management Companies;
  - Alex Levy cashed checks totaling $278,060.00;
  Smith Aff. ¶164.

- New Lite was paid $697,433.00 by insurers;
  - $339,347.00 was paid to the Management Companies;
  - Alex Levy cashed checks totaling $176,247.00;
  Smith Aff. ¶165.

- Qi Bao was paid $391,562.00 by insurers;
  - The Management Companies were paid 58% ($229,443.00);
  - Alex Levy cashed checks totaling $161,419.00;
  - Su (the "paper-owner") received only $40,434.00;
  Smith Aff. ¶166.

- Tai Ji was paid $462,625.00 by insurers;
  - The Management Companies were paid 60% ($278,401.00);
  - Alex Levy cashed checks totaling $176,782.00;

- • Yu (the "paper-owner") received only $120,796.00;
  Smith Aff. ¶167.

- Align was paid $577,835.00 by insurers;
  - • The Management Companies were paid 53% ($307,377);
  - • Alex Levy cashed checks totaling $196,285.00;
  - • Lentini (the "paper-owner") received only $24,000.00;
  Smith Aff. ¶168.

- Comfort was paid $333,448.00 by insurers;
  - • The Management Companies were paid 58% ($193,883.00);
  - • Alex Levy cashed checks totaling $124,716.00;
  - • Tikranian (the "paper-owner") received only $27,700.
  Smith Aff. ¶169.

As is demonstrated by the foregoing, the proceeds obtained through the commission of the instant insurance fraud scheme were laundered by the defendants with the knowledge that the subject transactions were intended to conceal and/or disguise the nature and source of the proceeds. The defendants conducted the foregoing transactions for the express purpose of concealing and/or disguising the nature, source, ownership and/or control of the proceeds of the instant insurance fraud scheme. Smith Aff. ¶177. Each of the foregoing transactions was knowingly structured by the defendants to avoid currency transaction reporting requirements under federal and New York law. *Id.* Allstate estimates that the defendants' fraudulent medical billing scheme involved hundreds of such transactions.

 2. Relevant Persuasive Authority

Allstate recently obtained prejudgment relief in the matter of *Allstate Ins. Co. v. Rozenberg*, C.A. No. 08-CV-565 (ADS)(ETB) (E.D.N.Y. Jan. 26, 2009) (a copy of this unpublished decision is annexed hereto at Exhibit 1). In *Rozenberg*, this Court granted Allstate a $3,000,00.00 attachment based upon Allstate's showing that (1) it had sufficiently demonstrated a probability of success on the merits of its claims, and (2) defendants secreted and/or disposed of assets with the intent to defraud creditors. *See id.*, slip op. at pp. 12-13. Specifically, this Court held that "[b]y presenting

23

evidence of this money laundering scheme, the Plaintiffs have made a prima facie showing that [Defendants] secreted assets for the purpose of evading creditors." *Id.* at p. 13 (alterations added). The Court's attachment order not only applied to the defendants' real and personal property, but it also extended to the PC Defendants' account receivables.

3. *The Attachment Order Should Extend to PC Defendants' Tangible Assets*

Allstate maintains that the parallels between *Rozenberg* and the instant matter—the existence of a money laundering scheme, same intent to secret assets and evade creditors—warrants the issuance of an attachment order against the tangible assets of the PC Defendants—i.e., any and all No-Fault proceeds current in the possession of the PC Defendants (or their counsel or management companies), and any "outstanding" proceeds subject to collection procedures under New York's No-Fault laws. Such relief was recently granted in the matter *Allstate Ins. Co. v. Howell*, C.A. No. 09-cv-04660(RJD)(VVP) (E.D.N.Y. Nov. 18, 2009) (order granting plaintiffs' motion for prejudgment attachment of assets) where it was alleged that the medical professional service corporations were owned and controlled by non-licensed laypersons and management companies, and that these laypersons and entities laundered the proceeds of the scheme.

As a result of the orders in *Rozenberg* and *Howell*, various New York insurers and No-Fault collection counsel are now enjoined from issuing any payments to the PC Defendant clinics until Allstate's civil RICO action is concluded. In *Rozenberg*, the decision to enjoin the PC Defendants from obtaining additional No-Fault payments, or aggressively litigating and collecting allegedly outstanding No-Fault benefits, was predicated, in part, on the Court's finding that Allstate had "set forth, in impressive detail, the structure of the Defendants' alleged scheme" which included particularized allegations regarding defendants' violation of New York's No-Fault laws, and the laundering of No-Fault proceeds to further conceal and/or secret their fraudulent activity. *See* Ex. 1 at p. 9.

Allstate avers that the same result should obtain here given the allegations that the Management Companies and their layperson principals—as the *de* facto owners of the PC Defendants—routinely and systematically violated New York law to collect insurance proceeds to which they were not entitled.  In this case, the PC Defendants and the Management Companies shared the same office space.  In addition, the PC Defendants funneled money to the Management Companies and their layperson principals under the guise of management "fees" and other fictitious charges.  Smith Aff. ¶¶ 161-169.  While a majority of insurance proceeds were actually deposited into the accounts of the PC Defendants, the funds were, in large part, moved into the operating accounts of the Management Companies and their layperson principals.  *Id.*

Similar to the *Rozenberg* and *Howell* matters, there is ample evidence demonstrating the defendants' secretion and dissipation of No-Fault proceeds through an organized money laundering scheme.  *See* Exhibit 1 (annexed hereto).

    4.    *An Attachment Order Should Issue Whereas Defendants Have Secreted Property and Acted with the Intent to Defraud Creditors*

Based on the actions of the defendants as described above, the proceeds of the defendants' fraud scheme have been dissipated.  As such, Allstate has demonstrated the requisite disposal/secretion of property sufficient to warrant prejudgment relief.  *See* C.P.L.R. § 6201.  In the context of money laundering, "simply taking steps to hide illicit funds is sufficient to prove concealment."  *See United States v. Cuellar*, 478 F.3d 282, 290 (5th Cir. 2007) (discussing the concealment element of 18 U.S.C. 1956 (laundering of monetary instruments)).

Allstate avers that the foregoing analysis regarding the concealment and secretion of assets should apply to the instant matter whereas the defendants' repeated transactions with sham management entities and their layperson owners was the primary method of concealing the illicit proceeds of defendants' scheme to defraud.  Allstate maintains that the defendants used complex (and secret) transactions between the PC Defendants, the Management Defendants, and their

layperson owners to conceal/secret/dissipate the illicit funds generated from the instant fraud scheme. The nature of the defendants' transaction(s) contain many of the "hallmarks" of an intent to conceal/secret funds from their creditors: (1) converting No-Fault proceeds to cash to eliminate a "paper trail" of defendants' illicit conduct; (2) issuing payments to fictitious entities to create the appearance of legitimate business expenses on the part of the Management Defendants; (3) structuring payments to evade federal currency reporting requirements (in addition to reducing/evading the Management Defendants' state and federal tax liability through the appearance of additional "legitimate" business expenses); and (4) consummating financial transactions to conceal the true "owners" of the funds—Daniel Levy, Alex Levy and the Management Defendant entities (i.e., the *de facto* owners of the PC Defendants and non-licensed individuals/entities who received insurance proceeds for the provision of medical treatment).  Through their illicit money laundering and transaction structuring, defendants systematically secreted and dissipated fraudulently obtained assets sufficient to warrant the relief requested by Allstate. *See Rozenberg*, C.A. 08-cv-00565(ADS)(ETB), slip op. at pp. 12-14.

The defendants' fraudulent conduct described above leads to the conclusion that if the relief requested herein is not granted, defendants will continue to conceal, dissipate, and/or secret the insurance proceeds wrongfully obtained from Allstate.  Accordingly, there are compelling reasons supporting Allstate's instant request for prejudgment relief.

### D.  The Amount Demanded from Defendants is Greater than the Amount of all Known Counterclaims

To date, Allstate is unaware of any pending or potential counterclaims available to defendants. *See* Bruno Aff. at ¶ 24.  Accordingly, Allstate has demonstrated that "the amount demanded from the defendant exceed all counterclaims known to the plaintiff" pursuant to C.P.L.R. § 6212(a).

26

### E. The Amount of Plaintiffs' Undertaking

Allstate requests that this Court restrict the amount of the undertaking to a marginal percentage of the amount attached. Federal court decisions interpreting New York's attachment law support this request. *See, e.g., Astra Oil Trading NV v. PRSI Trading Co. LP*, 2008 U.S. Dist. LEXIS 106194, *6 (S.D.N.Y. Dec. 23. 2008) (ordering undertaking of $12.4 million for attachment of $156 million—8% undertaking imposed to compensate defendants' potential damages for loss of use of attached funds); *NY Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*, 2008 U.S. Dist. LEXIS 40517, *19-20 (S.D.N.Y May 15, 2008) (finding $50,000 undertaking appropriate for $1.1 million attachment); *County of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assoc., LP*, 2006 U.S. Dist. LEXIS 24375, *4 (N.D.N.Y. Mar. 22, 2006) (ordering $50,000 undertaking to secure attachment order—plaintiff claimed $4,721,849 in damages).

The amount of money secured by the undertaking is intended to compensate the aggrieved party for all expenses incurred as a proximate result of the attachment, including counsel fees and loss of interest. *See* 1-28 WEINSTEIN, KORN AND MILLER, *CPLR Manual*, § 28.09 (2008). Allstate maintains that the risk of injury to defendants through an attachment order is very small in this matter. Allstate's Complaint and submissions in support of its attachment application clearly demonstrate that plaintiffs have a strong probability of success on the merits of their claims. Moreover, plaintiffs have sufficiently demonstrated that defendants have actively transferred, dissipated and/or secreted assets with the intent to frustrate the enforcement of an eventual judgment. Accordingly, Allstate submits that it is unlikely that defendants could sustain a valid claim for wrongful attachment.

Allstate requests that this Court order the posting of a $100,000 undertaking should an attachment order issue in this matter. This amount should be more than sufficient to compensate defendants for any damage that may arise from the attachment order. As this Court recently ordered in the *Rozenberg* matter, "[i]n order to provide proper indemnification to the applicable defendants in

27

the event of a future determination that this attachment is wrongful, and in view about the amount of money involved in [that] attachment," a bond in the amount of $100,000 would be appropriate. *See Rozenberg*, C.A. No. 08-cv-00565(ADS)(ETB), slip op. at pp. 14-15. Lastly, in the event defendants ever become eligible for wrongful attachment damages, their recovery is not limited to amount of the undertaking posted by plaintiffs. *See* CPLR § 6212(e).

IV.     **CONCLUSION**

WHEREFORE, for all the reasons detailed herein—and for all the reasons set forth in plaintiffs' Complaint (Docket # 1), and the Affidavits of Richard Smith and Michael Bruno (filed herewith), plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate New Jersey Insurance Company, respectfully request that this Honorable Court enter an Order **GRANTING** an attachment on defendants, Daniel Levy, Alex Levy, Hoi Yat Kam, M.D., Salvatore Lentini, D.C., Haroutyoun Tikranian, D.C., Yan Yan Yu, Cheng He Su, Aleksandra Gashinskaya, M.D., Lai Fan Xue, Desmond Connell, Esq., Mary Jiminez, Lloyd Modesto, Ronald Schwartz, Dan Madrid, Bronx Sheridan Medical, P.C., New Lite Bronx Medical, P.C., Comfort Chiropractic, P.C., Align Chiropractic Care, P.C., Qi Bao Acupuncture, P.C., Tai Ji Acupuncture, P.C., Best Star Advertisement Corp., Pro-Two Management Corp., and United Medical Billing & Collection Corp.'s, real and personal property assets in the amount of $2,750,000.00. Furthermore, Allstate respectfully requests that this Court order defendants to disclose all of their assets.

SMITH & BRINK, P.C.

Richard D. King, Jr., Pro Hac Vice Pending
Nathan A. Tilden, Pro Hac Vice Pending
Michael W. Whitcher, Pro Hac Vice Pending
Jasmine G. Vieux (JG1805)
1205 Franklin Avenue, Suite 260
Garden City, NY 11530
(347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company, Allstate Property*
*& Casualty Insurance Company, and Allstate*
*New Jersey Insurance Company*

Dated: April 4, 2010

29